UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

    Plaintiff,

v.                                  Case No. 07-CR-20214-DT

Melvin Legette,                Honorable Sean F. Cox

    Defendant.
_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

Defendant Melvin Legette ("Legette") is currently charged in an Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §922(g) and possession with intent to distribute marijuana in violation of 21 U.S.C. §841(a). Trial in this matter is scheduled to commence on June 28, 2007. The matter is currently before the Court on Legette's Motion to Suppress Statements, filed on May 24, 2007. The parties have fully briefed the issues and the Court held an evidentiary hearing, and heard oral argument by counsel, on June 12, 2007. For the reasons set forth below, Legette's Motion to Suppress Statements shall be **DENIED**.

BACKGROUND

It is undisputed that on March 14, 2007, officers of the Detroit Police Department executed a search warrant at Legette's residence at 17559 Biltmore in Detroit, Michigan. Legette and his girlfriend Shanel Woods ("Woods") were both present at the time of the search. There also appears to be no dispute that both Legette and Woods were "in custody" during the search of the premises. The dispute here centers on whether a statement allegedly made by Legette at the

1

scene ("That shit is mine, she ain't got nothing to do with it") was made in response to "custodial interrogation." Because the parties' briefs alleged divergent versions of the facts with respect to the circumstances surrounding the incriminating statement at issue, the Court held an evidentiary hearing on June 12, 2007.

During the evidentiary hearing on June 12, 2007, the Government presented two witnesses, Sergeant Ramon Valdez ("Valdez") and Officer Anthony Gavel ("Gavel"), while defense counsel presented one witness, Woods. For purposes of this motion, the Court makes the follow factual findings from the testimony.

## FINDINGS OF FACT

Valdez is a Sergeant with the Detroit Police Department. He has been employed by the Detroit Police Department for 25 years and has been a Sergeant for nine years.

Valdez was involved in the search of Legette's residence at 17559 Biltmore in Detroit, Michigan on March 14, 2007. Valdez was the officer in charge of the raid crew.

As the officer in charge of the raid crew, Valdez handed out assignments to the officers who were working that day as to what positions they were to take on the raid (*e.g.*, who would ride in what vehicles, what route would be taken to the location of the search, etc.). He briefed the crew on the target location from the search warrant as to where the crew was going, how they would get there, and, in the event that someone got injured, what route they would take to the hospital. Valdez's duties also included deciding, while at the scene, whether or not a forced entry would be made into the target location. Once inside the target location, he supervised the securing of the premises, the arrest of any individuals taking place in the home, and the confiscation of any evidence.

2

17559 Biltmore is a single family residence. At the time he executed the search, Valdez did not know who was living at the house.

When Valdez and his crew approached the house, Valdez announced his presence and the crew's purpose. He ordered a forced entry and then he and his crew entered the house. The crew first encountered Woods. Woods remained in the living room / kitchen area of the house with Valdez, while the rest of the crew continued to clear the house. Another individual, Legette, was then encountered coming up from the basement stairs. Legette was then brought to the living room / kitchen area with Valez and Woods. Legette was ordered to stand still, and to stay there until the house was deemed secure or clear. After the home was secured by the officers, Legette was handcuffed for officer safety. The search proceeded once the location was made secure. Valdez remained in the living room / kitchen area with Legette and Woods while the crew searched the premises.

After he was placed in the living room / kitchen area, as handcuffs were being placed on him and as the officers started the search after securing the premises, Legette, who knew Valdez from prior encounters,[1] called him by name asking, "What's up Valdez?" Valdez responded casually, telling him, "same old thing. You know what's happening. This is what we're here for." Valdez, whose previous contact with Legette led him to believe that Legette lived in a house located a half a block away, then asked Legette, "What are you doing here?" Legette responded that he had just moved to the house with his girlfriend. Valdez then asked him if he had moved there from the house down the street and Legette responded affirmatively. The

---

[1] Valdez had previously ticked and arrested Legette. Valdez had also had cordial conversations with Legette on the street that were not in an official capacity.

conversation between Legette and Valdez, which lasted no more than two to three minutes total, then ended.

At some point after the conversation had concluded, Officer Frazier Davis ("Davis") came up from the basement and told Valdez that the crew had found marijuana, zip-lock packaging materials, and a weapon in the basement. Legette was still in the same room with Valdez at this time, and was therefore able to hear the conversation. After Davis told Valdez that he had found drugs and a weapon in the basement, Legette said, "That shit is mine. She ain't got nothing to do with it." Legette's statement was not made in direct response to any express question asked by Valdez, Davis, or any other officer.

Woods, Legette's 19 year-old girlfriend who lived at the house with Legette, was approximately six months pregnant at the time of the search.

Standard of Decision

The parties agree that, with respect to this motion, the Government has the burden of proof. That is, the Government must show by a preponderance of the evidence that the statement at issue was not made in response to custodial interrogation. (*See* Tr. of 6/12/07 Hrg.).

ANALYSIS

"Under *Miranda*, a defendant must be given warnings about the exercise of his Constitutional rights whenever he is subjected to a 'custodial interrogation.'" *United States v. Murphy,* 107 F.3d 1199, 1204 (6th Cir. 1997)(citing *Miranda v. Arizona*, 394 U.S. 436 (1966)). Where a defendant makes a voluntary statement without being interrogated or pressured by an interrogator, however, the statements are admissible despite the absence of *Miranda* warnings. *Murphy,* 107 F.3d at 1204.

In this case, the parties agree that the incriminating statement at issue was made by Legette before he was read his *Miranda* rights. It is also uncontested that Legette was "in custody" at the time he made the statement. The issue is therefore whether he made the statement in response to "custodial interrogation" by the police.

The starting point for defining 'interrogation' in this context is, of course, the [Supreme] Court's *Miranda* opinion. There the Court observed that '[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980).

The Court went on to state that "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis,* 446 U.S. at 300. "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 300-301; *see also U.S. v. Avery*, 717 F.2d 1020, 1024 (6th Cir. 1983)(wherein the Sixth Circuit defines interrogation by quoting *Innis*). The *Innis* Court further explained that the "latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis,* 446 U.S. at 301.

"A practice that the police know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseen results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 301-302. In a footnote, the Court also explained that "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id*. at 302 n.8.

Here, Legette contends that he made the incriminating statement in response to custodial interrogation. He contends that he was subjected to custodial interrogation prior to making the statement, in that the following occurred before he was read his *Miranda* rights: 1) Valdez asked him "what are you doing here?"; and 2) later, another officer advised Valdez, within hearing distance of Legette, that the officers had found drugs and a gun during the search of the basement.

In support of his motion, Legette relies on *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993), wherein the court found that the question "what are you doing here" constituted custodial interrogation. The Court finds that the facts in *Perdue*, however, can be easily distinguished from the facts at issue here.

In *Perdue*, officers were executing a search warrant at a rural and remote location after aerial surveillance indicated that marijuana was being cultivated on the property. Two helicopters and fifteen to twenty law enforcement officers searched the premises. During the

search, two law enforcement officers ("Carreno" and "Tate") were assigned to perimeter security. During the search, a car entered the long dirt road leading to the property and Carreno and Tate were suspicious because it was a remote, rural area and anyone using the road was probably visiting the property being searched. Carreno and Tate stopped the car and, with weapons drawn, ordered Defendant Perdue and his fiancee to get out of the car and lie face down. Perdue obliged but his fiancee could not because she was nearly nine months pregnant at the time. Before reading Perdue his *Miranda* rights, the officers then asked him several questions. Carreno testified that, with guns still drawn and Mr. Perdue lying face down on the road, he asked Mr. Perdue what he was doing on the property and Mr. Perdue replied that he was there to check on his stuff. Carreno then asked Perdue "what stuff?" and Perdue replied, "The marijuana that I know that you guys found in the shed." Carreno further inquired whose marijuana it was, and Perdue replied that it was his and his fiancee's.

The district court denied Perdue's motion to suppress the statements but the United States Court of Appeals for the Tenth Circuit reversed. The court first concluded that Perdue was "in custody." It then had to determine if Carreno's questions amounted to "interrogation." The court found that it did, stating as follows:

> [W]e must ask whether the questions were 'reasonably likely to illicit an incriminating response.' *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689. The government admits that the officers asked the questions in order to confirm or dispel their suspicions about the marijuana. Given the fact that Mr. Perdue was entering a piece of property that was primarily used to grow marijuana, the initial question, 'What are you doing here?' was reasonably likely to illicit an incriminating response. When Mr. Perdue answered, 'To check on my stuff,' the questions that immediately followed, 'What stuff?' and 'Who does the marijuana belong to?' are the essence of interrogation. Therefore, the officers should have informed Mr. Perdue of his constitutional rights after 'neutralizing' him but before commencing with the interrogation. Their failure to do so constitutes a violation

7

of *Miranda.*

*Id.* at 1465.

The Court concludes that the facts of this case can easily be distinguished from *Perdue*. Unlike the situation in *Perdue* where the defendant was entering a rural property that was used primarily to grow marijuana, Legette was present inside a private residence where drugs and a weapon were found only in a limited area of the residence.

In *Perdue*, the officers asked questions to a suspect that they had no prior contact with, with guns drawn, and while he was face down on the ground. Here, in contrast, Valdez and Legette knew each other from prior encounters and that the two had a rather cordial relationship. Moreover, Legette *initiated* the conversation at issue with Valdez by asking him, "What's up Valdez?" Valdez then asked the question "what are you doing here" because it was his understanding that Legette lived in another house nearby the location at issue.

Moreover, in *Perdue*, the officers asked far more than the one initial question, "what are you doing here?" In response to that initial question, the defendant made an incriminating statement. The officers then, without reading the defendant his *Miranda* rights, proceeded to ask the defendant follow-up questions in response to the initial incriminating statement. Here, in contrast, Legette did not make any incriminating statement in response to the question "what are you doing here?" Thus, unlike the officers in *Perdue,* Valdez did not ask any follow-up questions to a initial statement that would be likely to elicit incriminating statements.

The Court concludes that the Government has shown by a preponderance of the evidence that Legette's statement was not made in response to custodial interrogation. The Court concludes that Valdez's questions in response to the conversation initiated by Legette do not

constitute "interrogation" because under the particular facts of this case, the questions were not "reasonably likely to elicit an incriminating response." Legette made the statement at issue after the brief conversation, initiated by Legette with Valdez, had already concluded.

The Court also rejects Legette's argument that the officers' actions (*i.e.*, Officer Davis advising Valdez, within hearing distance of Legette, that drugs and a weapon had been found in the basement) constitute the functional equivalent of express questioning because officers should have known such actions were reasonably likely to elicit an incriminating response.

Legette relies on *United States v. Walker*, 624 F.Supp. 103 (D. Md. 1985). The facts in *Walker*, however, differ substantially from the facts at issue here. In *Walker*, the defendant was arrested and informed that he was under arrest for the crime of espionage. He was then read his *Miranda* rights and he indicated that he did not wish to make a statement until he had spoken with an attorney. Nevertheless, five to ten minutes after defendant had invoked his right to remain silent, the officers showed him a copy of an incriminating document and defendant made a statement commenting on the document approximately an hour later. The district court suppressed that statement, concluding that when the officers showed defendant the incriminating document after he invoked his right to remain silent, the officers had to know that such an act was reasonably likely to elicit an incriminating response from defendant. The court concluded that the mere showing of the incriminating document to the defendant was the functional equivalent of an express question directed to him concerning his espionage activities and that a response was implicitly called for.

Here, on the other hand, the officers did not show Legette any incriminating documents or any incriminating evidence. The factual circumstances, rather, are more akin to those seen in

9

*Innis*. In that case, the defendant indicated that he wanted to speak to a lawyer after he was arrested and read his *Miranda* rights. The defendant was then placed in a patrol car and was taken to the police station. While en route to the station, one of the officers had a conversation with another officer in the patrol car and during that conversation the officers discussed that because a school for handicapped children was located nearby, they were concerned that if the missing shotgun were left in that area one of the children might find it and get hurt. The defendant then interrupted the conversation, stating that the officers should turn the car around so he could show them were the gun was located.

While there was no express questioning of the defendant, the Court was called upon to determine if actions of the officers were the functional equivalent of express questions. The Court answered that question in the negative. The Court concluded that the "conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited." *Innis,* 446 U.S. at 302. The Court further stated:

> Moreover, it cannot be fairly concluded that the [defendant] was subjected to the 'functional equivalent' of questioning. It cannot be said, in short, that Patrolmen Gleckman and McKenna should have known that their conversation was reasonably likely to elicit an incriminating response from the [defendant]. There is nothing in the record to suggest that the officers were aware that the [defendant] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest.
>
> The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the [defendant] would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's

> contention that, under the circumstances, the officers' comments were particularly 'evocative.' It is our view, therefore, that the [defendant] was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Id.* at 302-303.

At the time that Officer Davis entered the kitchen and spoke to Valdez, the brief conversation between Valdez and Legette had already ended. Thus, there was no express questioning of Legette that prompted his statement. In fact, there was no question posed to Legette after the brief conversation with Valdez had ended. The Court concludes that, like the circumstances seen in *Innis,* the actions of the officers did not constitute the functional equivalent of express questioning.

Like the situation seen in *Innis,* the conversation was a dialogue between two officers that did not invite a response from the defendant. It cannot be said that Davis and Valdez should have known that their conversation was reasonably likely to elicit an incriminating response from Legette. There is nothing in the record to even suggest that the officers were aware that Legette was peculiarly susceptible to concerns about whether his pregnant fiancee would be arrested; nor is there anything in the record to suggest the officers believed that Legette was unusually disoriented or upset at the time. Like *Innis*, this case boils down to whether in the context of a very brief conversation (*i.e.*, one statement from Davis to Valdez that drugs and a weapon had been found), the officers should known that the defendant would suddenly be moved to make a self-incriminating response. The Court concludes that, under the circumstances presented here, Legette was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

Accordingly, the Court shall deny Legette's motion seeking to suppress the incriminating statement at issue.[2]

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that Defendant Legette's Motion to Suppress Statements [Docket Entry No. 14] is hereby **DENIED**.

**IT IS SO ORDERED**.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: June 20, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 20, 2007, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager

---

[2] The Court notes that, in addition to asserting that his initial statement be suppressed, Legette also asserted in his motion that his post-*Miranda* statements should also be suppressed along with the initial statement. Given the Court's determination that the Legette's initial statement should not be suppressed, however, such arguments are moot.